IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN BROWN, | ) |
|     Plaintiff, | ) Civil Action No. 3:22-105 |
|     v. | ) Magistrate Judge Patricia L. Dodge |
| BROOKE CIVIELLO, JOYCE KNOWLES, and DOCTOR BLOOM, | ) |
|     Defendants. | ) |

### MEMORANDUM OPINION[1]

Brian Brown ("Brown"), a *pro se* state prisoner, brings this civil rights action against Defendants Brooke Civiello, Joyce Knowles, and Dr. Adam Bloom. Brown's claims arise from his medical care, mental health treatment, and subsequent suicide attempt while housed at the State Correctional Institute ("SCI") at Houtzdale. Brown alleges that Defendants failed to provide adequate medical treatment and failed to protect him from himself in violation of his Eighth and Fourteenth Amendment rights.

Pending before the Court are two motions for summary judgment, one filed by Defendant Civiello (ECF No. 64) and another by Defendants Knowles and Dr. Bloom (ECF No. 68). For the following reasons, both motions will be granted.

**I.    Relevant Procedural History**

Brown initiated this action in June 2022 with the filing of a motion for leave to proceed *in forma pauperis*. (ECF No. 1.) He then filed an Amended Complaint, which was docketed upon

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, the undersigned has the authority to decide dispositive motions and enter final judgment.

the granting of his motion.[2] (ECF No. 12.) The Amended Complaint asserts two civil rights counts under 42 U.S.C. § 1983, alleging Eighth and Fourteenth Amendment violations, and seeks relief in the form of compensatory damages and transfer to another prison.[3]

On October 31, 2022, Defendant Civiello answered the Amended Complaint. (ECF No. 19.) That same day, Defendants Knowles and Bloom moved to dismiss. (ECF No. 20.) After their motion was fully briefed (ECF Nos. 32, 34, 35), the Court issued a Memorandum Opinion and Order (ECF Nos. 36, 37) on March 9, 2023, granting the motion in part and dismissing Brown's Fourteenth Amendment claim and Americans with Disabilities ("ADA") claim against the moving Defendants.[4] The motion was denied in all other respects. (ECF No. 37.) Thus, following disposition of the motion to dismiss, Brown's remaining claims are an Eighth Amendment claim against all three Defendants and a Fourteenth Amendment claim against Defendant Civiello only.

Defendant Civiello moved for summary judgment on November 29, 2023 (ECF No. 64), and Defendants Knowles and Bloom followed suit on November 30, 2023 (ECF No. 68). Both motions have now been fully briefed (ECF Nos. 65, 66, 67, 69, 72, 74, 80, 81, 85, 86, 87) and are ripe for review.

---

[2] Brown's original Complaint (ECF No. 1-1) was lodged pending disposition of his motion to proceed *in forma pauperis* ("IFP"). This complaint named additional defendants and set forth a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Rehabilitation Act, 29 U.S.C. § 701 *et seq.* Before the Court ruled on the IFP motion, Brown filed an Amended Complaint (ECF No. 10), which removed many of the defendants and contained no ADA or Rehabilitation Act claims. The Amended Complaint was docketed after the Court granted Brown's IFP motion and is the operative complaint in this case. (ECF Nos. 11 & 12.)

[3] Brown requests transfer to SCI Chester. (ECF No. 12 at 7.)

[4] While the ADA is not actually mentioned in the Amended Complaint, Brown asserted in his response to the motion to dismiss that "[e]ach defendant violated the Americans with [D]isability Act in this case." (ECF No. 32 ¶ 10.) The Court found this attempt by Brown to amend his claim via his response in opposition to the pending motion improper. The Court further noted that amendment in this instance would nevertheless be futile, as individuals cannot be found liable under Title II of the ADA. (ECF No. 36 at 8-9.)

## II. Relevant Factual Background[5]

Brown has been incarcerated and in the custody of the Pennsylvania Department of Corrections (the "DOC") at all relevant times. From November 2021 until October 2022, he was housed at SCI Houtzdale. (ECF No. 67-1 at 4.) At the time of his arrival, he had already been diagnosed with and was actively receiving treatment for anti-social personality disorder, borderline personality disorder, persistent depressive disorder or dysthymia, unspecified anxiety disorder, alcohol and cannabis disorders, and was classified as a "C" stability inmate.[6] (ECF No. 74-3 at 1-4.)

### A. Brown's previous mental health history

Prior to SCI Houtzdale, Brown was housed at SCI Phoenix. (*Id.* at 4-6.) On August 3, 2021, he cut his forearm with a razor, prompting a response by psychology, psychiatry, and medical staff. Brown was transported to an outside hospital for medical attention where he required stitches. (ECF No. 74-3 at 34.) Upon his return to SCI Phoenix, he was placed in a Psychiatric Observation Cell ("POC")[7] on suicide watch. (*Id.*) After approximately twenty days, he was released, but was readmitted to a POC on September 2, 2021, after engaging in additional self-injurious behavior and threatening suicide. (*Id.* at 83.) DOC medical staff noted in Brown's charts that earlier in the day, he "had been upset believing he was going to be discharged" to the

---

[5] The following facts are drawn from Defendants' concise statements of material facts (ECF Nos. 66, 67, 72, 74) and Plaintiff's verified responses thereto (ECF Nos. 80, 85). Except where otherwise indicated, these facts are undisputed.

[6] The DOC utilizes a roster system to categorize inmates with respect to their mental health needs. Inmates on the "C" Mental Health Roster are actively receiving mental health care but are not considered to suffer from a "serious mental illness." *See* ECF No. 72 ¶¶ 10-13.

[7] A "POC" is "a temporary housing location for inmates experiencing mental health crises or who pose an imminent threat of harm to themselves or others." (ECF No. 72 ¶ 8.)

Restrictive Housing Unit ("RHU").[8] (*Id.*)

Brown remained in the POC at SCI Phoenix until September 28, 2021, when he was transferred to the Mental Health Unit ("MHU")[9] at SCI Waymart.[10] (*Id.* at 107.) Shortly after arriving, medical staff noted the following in Brown's chart:

> Per security a letter was screened from [Brown] to "babe" in which a plan to stay on the eastern side of the state is noted, that he "didn't want to do what he did to get here" and that it was his only way to get out of [SCI] Phoenix "hole" and that if "this ave doesn't work at least we know we tried." In the letter he also encourages "babe" to tell social worker on MHU that she has been getting dark, distressing letters from him.

(*Id.* at 112.) Letters to "babe" are referenced several more times in Brown's medical charts, with staff noting concern that Brown may be exaggerating or inventing symptoms to manipulate his housing assignment. (*Id.* at 173, 177, 187, 252, 392, 450, 470.) For example, in a subsequent letter to "babe," Brown allegedly mentioned how he had been "talking about voices" despite showing no objective signs of psychosis. (*Id.* at 450.)

Brown remained in the MHU without further incident for several weeks. (*Id.* at 113-468.) Despite Brown's reports of ongoing depression and anxiety, medical staff noted that he did not show any objective symptoms and was not responding to changes in medication. (*Id.* at 449-54.) On November 2, 2021, Brown's psychiatrist noted that:

> A meeting was held with [SCI] Phoenix and [SCI] Houtzdale to discuss [Brown's] discharge. It is anticipated that inmate may act out or have a suicidal gesture once transferred to his new institution as he is not staying at [SCI] Waymart, which has

---

[8] An "RHU" is "a unit where inmates are housed in disciplinary custody, or are otherwise in administrative or protective custody." (ECF No. 72 ¶ 14.)

[9] An "MHU" is "an inpatient hospital-style unit within the DOC for the treatment of acute mental illnesses." (ECF No. 72 ¶ 17.) Brown had previously been in the MHU at SCI Waymart in 2019 and in early 2021. (ECF No. 74-3 at 107.)

[10] On September 22, 2021, medical staff initiated a 304-commitment hearing; the petition was granted. *See* ECF No. 72 ¶¶ 47-49. A "304" is "another term for an involuntary commitment in the Commonwealth of Pennsylvania, requiring an order of court for its imposition." (*Id.* ¶ 26.)

4

> been his identified goal. It is anticipated that inmate may try to show that he is still very depressed and suicidal and needs to go back to the MHU and then the FTC[11] so he can pursue contact with someone he previously had a relationship with. Inmate's continued statements of depression and the need to stay in the FTC appear conditional upon this desire to maintain contact with this identified person. He has maximized his benefit in the MHU and is ready for discharge. He maintains decisional capacity around his personal safety choices and is aware of supportive resources, including psychology, should he report increasing suicidal thoughts. While the risk of him acting to harm himself is possible, it is not the product of an acutely treatable psychiatric condition. He is receiving appropriate medications, appropriate care, and has a solid and supportive discharge plan that continues to address his needs.

(*Id.* at 450-51.) As a result, Brown was discharged from SCI Waymart's MHU to SCI Houtzdale on November 4, 2021. (*Id.* at 467.)

In accordance with DOC protocol, Brown was placed in a POC upon his arrival at SCI Houtzdale. (ECF No. 72 ¶ 56.) Joyce Knowles, CRNP ("Knowles") assessed Brown on November 5, 2021. (*Id.* ¶ 57.) Knowles was employed as a Nurse Practitioner, providing psychiatric services to DOC inmates, and was a member of Brown's treatment team in 2021 and 2022. (ECF No. 74-2 ¶¶ 2-7.) Based on Knowles' assessment, Brown was discharged to SCI Houtzdale's Special Needs Unit ("SNU").[12] (ECF No. 72 ¶¶ 57-59.)

Dr. Adam Bloom, MD ("Dr. Bloom") routinely provided psychiatric services to DOC inmates incarcerated at SCI Houtzdale during this time. (ECF No. 74-1 ¶¶ 1-3, 5.) Dr. Bloom attempted to assess Brown in the SNU on November 15, 2021, but Brown refused. (ECF No. 74-3 at 488-91.) Mere hours later, Dr. Bloom was notified that Brown was threatening self-injury. (ECF No. 72 ¶ 61.) In response, Dr. Bloom ordered that Brown be readmitted to a POC for

---

[11] SCI Waymart's Forensic Treatment Center ("FTC") houses inmates who require intensive psychiatric treatment. *See* https://www.cor.pa.gov/Facilities/StatePrisons/Pages/Waymart.aspx.
[12] An "SNU" is "a housing unit for inmates with special mental health or medical needs to receive additional or specialized treatment services and support." (ECF No. 72 ¶ 20.)

observation.  (*Id.*)  While in the POC, Brown described hearing voices, expressed his desire to have his medications changed, and inquired about changing his housing status.  (ECF No. 74-3 at 500.)  Another medical provider noted that Brown had been refusing all medications since November 6, 2021, and "may be presenting this way for secondary gain: change to desired medications and trying to get to [a Secure Residential Treatment Unit[13]]."  (*Id.*)

The following day, Dr. Bloom evaluated Brown, at which time "[n]o signs of acute distress [were] observed."  (*Id.* at 507.)  Brown stated that he was no longer suicidal, and despite his reports of hearing voices, Dr. Bloom noted that Brown's presentation was "inconsistent with genuine psychosis."  (*Id.*)  Dr. Bloom acknowledged that while there was a risk of future self-injurious behavior, it was "unlikely to be modifiable with psychiatric intervention[,]" and that Brown would continue to be "seen in near future due to POC discharge by psychology and psychiatry."  (*Id.*)  As a result, Brown was discharged from the POC on November 16, 2021.  (*Id.* at 507-08.)

Dr. Bloom assessed Brown again in the SNU on November 26, 2021.  (*Id.* at 509-14.)  Brown continued to report auditory hallucinations, depression, and requested both medication and housing changes.  (*Id.* at 509.)  Dr. Bloom spoke with Brown about treatment goals, switching some of his medications, access to care, and once again concluded that Brown's alleged symptoms were "inconsistent with genuine psychosis."  (*Id.* at 509-10.)

At around 1:00 p.m. on November 30, 2021, Dr. Bloom responded to a notification that Brown had swallowed an unknown quantity of psychiatric medication.  (*Id.* at 515-18.)  Dr. Bloom recorded the event in Brown's charts:

> Psychiatrist notified that Mr. Brown reported taking an unknown number of seroquels [sic].  He apparents [sic] was told he was being given a cell[mate] and

---

[13] A "Secure Residential Treatment Unit" is "a housing unit for inmates with significant behavioral problems, who also have mental health needs." (ECF No. 72 ¶ 16.)

> threatened to kill whoever was put in his cell. When told he would be sent to RHU he stated he would kill himself and then went to sink and acted as if he took pills although pills were not witnessed. Unclear if he took pills or not. He is being medically admitted to infirmary for observation and security has restricted belongings due to gestural threats. No indication for POC placement due to clear secondary gain. Medication will be discontinued due to inefficacy and lack of safety with possibility he is overdosing for purposes of gestural threats and leveraging housing. Will assess further once medically clear.

(*Id.* at 515.)

Later that day, another medical provider tried to assess Brown, who refused to engage. But when a member of DOC security staff expressed doubt as to whether Brown had in fact taken any medication, the provider noted that Brown "**immediately** began presenting as though the medications were effecting [sic] him." (*Id.* at 523) (emphasis in original). The next day, Dr. Bloom evaluated Brown:

> He reportedly feigned lethargy as immediately upon swallowing he presented as lethargic and then at other times like walking around and making bed in infirmary cell he presented as coordinated and without lethargy then when coming to cell door he would feign lethargy again and act sluggish. Today he presented in similar fashion as when asked to speak he took a great length of time to raise head and look toward door. He was informed his medications were being discontinued secondary to lack of efficacy and that he is reporting he is taking additional pills which makes medications potentially unsafe. He did not respond to further questions.

(*Id.* at 524.) He added that Brown "continues acting out behaviors when faced with situations he does not desire such as having a cell[mate]." (*Id.* at 526.)

Brown was regularly seen by mental health providers throughout December 2021 and January 2022, during which he continued to report symptoms of depression, auditory hallucinations, and requested medication. (*Id.* at 536-55.) On December 28, 2021, Dr. Bloom evaluated Brown and discussed his lack of response to previous medications, lack of clinical indication, and the risk of medications not outweighing any potential benefits due to Brown's

7

history of self-harm gestures with pills.  (*Id.* at 556.)  Based on Brown's presentation, Dr. Bloom ordered a routine psychiatric follow-up within ten to twelve weeks.  (*Id.* at 559.)

### B.  Brown's suicide attempt on February 11, 2022

On February 11, 2022, Brown was being housed in general population at SCI Houtzdale.  (ECF No. 66 ¶¶ 5-6.)  According to Brown, he had "made plans to end his own life, so he requested to speak with his unit's psychologist (Defendant P.S.S. Civiello) in [an] attempt to leave his family with closure on his final decision."  (ECF No. 80 at 2.)  At all relevant times, Brooke Civiello ("Civiello") was employed by the DOC as a Psychology Services Specialist at SCI Houtzdale, performing "professional level work in the application of psychological principles, practices, and services to inmates in achieving diagnostic, classification, and treatment goals."  (ECF No. 66 ¶¶ 8-9.)  While she did independently assess inmates, Civiello worked under the general supervision of a licensed psychologist or administrative supervisor.  (*Id.* ¶¶ 11-12.)  She could not prescribe medications or authorize placement of potentially suicidal inmates in POCs.  (*Id.* ¶¶ 13, 15.)  Instead, she could only assess inmates to make referrals and recommendations for follow-up care.  (*Id.* ¶ 14.)

Civiello first met with Brown at 10:22 a.m. on February 11, 2022.[14]  (*Id.* ¶ 16.)  Brown alleges that he "immediately notified [Civiello] that he was having continuouse [sic] thoughts of killing himself 'right now!'" and "explained to defendant Civiello how he planned to kill himself, by way of biting or cutting the veins from his arm."  (ECF No. 80 at 2.)

Civiello documented her encounter with Brown in a Mental Health Contact Note.[15]  (ECF

---

[14]  Civiello states that the meeting "took place on F Block outside of Plaintiff's cell."  (ECF No. 66 ¶ 16.)  However, medical records indicate that Brown was "[s]een in psychology office[.]"  (ECF No. 67-5 at 4.)
[15]  Civiello electronically signed the documentation at 11:26 a m. on February 11, 2022.  (ECF No. 67-5 at 2-5.)

8

No. 67-5 at 2-5.) Her notes reflect that she "was unable to clarify that [Brown] was having intent of suicide or self-harm with his current statements." (*Id.* at 3.) Under "Comments/Concerns," she wrote:

> Completed grounding exercises with the individual due to his presentation of anxiousness, rubbing hands on legs, rocking in chair, limited eye-contact and tearfulness. He appeared to calm slightly. Discussed his expressed depression and anxiety feelings, attempted to discuss his coping skills. PSS determined with discussion that individual needed to be assessed by psychiatry for possible POC placement. PSS called CRNP Knowles and Dr. Bloom. Dr. Bloom stated that this appears to be the individual's baseline and declined for the individual to be brought up for evaluation. Individual was informed of this, was offered to continue the session, individual determined he wanted to return to his cell at this time.

(*Id.* at 4.)

At approximately 12:00 p.m., DOC security staff conducting an afternoon count observed blood in Brown's cell. (ECF No. 67-2 at 3.) Brown, sitting at his cell desk, "appeared lethargic and was bleeding from his left forearm." (*Id.*) He was removed from his cell and escorted to medical where staff treated a small laceration and multiple abrasions on his left arm.[16] (*Id.*) Brown had also been observed "slumped over and vomiting clear fluid," was noted as having an "altered mental status," and was minimally responsive. (*Id.* at 18.) As a result, medical staff suspected a possible drug overdose and Brown was transported to UPMC Altoona for further evaluation. (*Id.* at 18-19.) He spent four days in the hospital before ultimately being discharged back to SCI Houtzdale in stable condition. (ECF Nos. 67-3; 74-3 at 570-71.)

### III. Legal Standard

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

---

[16] Written statements from DOC corrections officers confirmed that Brown had used a razor blade to engage in self-injurious behavior. (ECF No. 67-2.)

9

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.     Discussion**

Brown's claims are brought pursuant to 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 does not itself create any substantive rights; it simply provides a cause of action that allows the plaintiff to vindicate rights that have already been secured. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("§

1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere"). Brown alleges violations of the Eighth and Fourteenth Amendments. U.S. Const. amend. VIII, XIV.

### A. Fourteenth Amendment claim against Civiello

Brown alleges that Civiello violated his Fourteenth Amendment rights.[17] The Fourteenth Amendment "protects a prisoner's right to medical privacy, subject to legitimate penological interests." *Doe v. Delie*, 257 F.3d 309, 311 (3d Cir. 2001). But the Supreme Court of the United States has made clear that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

In her brief, Civiello correctly notes that Brown's "Fourteenth Amendment claim appears to be based on the same factual averments underlying his Eighth Amendment claim." (ECF No. 65 at 4.) Brown alleges:

> [N]ot only did defendant Civiello disregard the warning given to her by the plaintiff and his plans on how he would kill himself, she also failed to notify defendants CRNP Knowles and Dr. Bloom of the plaintiff's reported intent to immediately harm himself, which resulted in the defendants refusing to place the plaintiff on suicide watch, and ultimately resulting in the plaintiff going back to his cell unstable, where he was able to harm himself.

(ECF No. 80 at 4.)

However, as the Court recognized when analyzing the previous motion to dismiss in this case, because Brown is a convicted and sentenced state prisoner, the Eighth Amendment provides the explicit source of constitutional protection for his claim of deliberate indifference to his particular

---

[17] Brown initially alleged that all Defendants violated his Fourteenth Amendment rights. The claims against Knowles and Dr. Bloom did not survive the later motion to dismiss and were dismissed with prejudice. *See* ECF Nos. 36, 37.

vulnerability to suicide. (ECF No. 36 at 7-8.) As such, Brown's Fourteenth Amendment claim against Civiello will be dismissed with prejudice.

### B. Eighth Amendment claims against Civiello, Knowles, and Dr. Bloom

Brown alleges that all three Defendants violated his rights under the Eighth Amendment. The Eighth Amendment prohibits cruel and unusual punishment, which has been interpreted to include deliberate indifference to an inmate's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on a claim brought under the Eighth Amendment, a prisoner must show: (1) that they were subjected to a deprivation that was "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; and (2) that prison officials acted with "deliberate indifference to the prisoner's . . . needs," which occurs only if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

A claim of vulnerability to suicide "is simply a more specific application of the general rule" because "[i]n essence, a 'particular vulnerability to suicide' is just one type of 'serious medical need.'" *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)). The Third Circuit has held that:

> [W]hether a pre-trial detainee or a convicted prisoner, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

*Id.* at 223-24. "A particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented." *Id.* at 230. The "strong likelihood" of suicide "must be so obvious that a lay person would easily recognize the necessity for preventative action." *Id.* at 222 (quoting

*Colburn*, 946 F.2d at 1025 (citation and quotation marks omitted).

The Third Circuit has clarified that failure to meet a prisoner's serious need for mental healthcare is a separate claim from a vulnerability to suicide claim. *Id.* at 227. Both claims, however, may coexist. *See, e.g.*, *DeJesus v. Delaware through Delaware Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) ("Because these are two different claims, and the District Court did not examine one of them, namely Plaintiffs' claim of deliberate indifference to a serious medical need, we will remand.")

1. Claim against Civiello

Brown contends that Civiello was deliberately indifferent by failing to prevent him from returning to his cell after Brown informed Civiello that he intended to kill himself "right now!" (ECF No. 80 at 2.) However, even when viewing the record in the light most favorable to Brown as the non-moving party, this allegation is unsupported.

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from their burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g.*, *Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding a *pro se* plaintiff was still "required to 'designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories . . . sufficient to convince a reasonable fact finder to find all the elements of [their] prima facie case.'") (quoting *Lauren W. ex rel. Jean W. v. DeFlamanis*, 480 F.3d 259, 266 (3d Cir. 2007); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law.")

13

Brown's timestamped medical records reflect that Civiello met with Brown prior to his suicide attempt, reviewed his past mental health history and various risk factors, offered counseling, completed grounding exercises with him, assessed his current mental state, and offered to extend the session and provide additional counseling services which Brown ultimately declined. (ECF No. 67-5 at 2-5.)  Despite Brown's allegations to the contrary, Civiello's notes indicate that she could not ascertain whether Brown was expressing an immediate desire to harm himself.  (*Id.* at 3) ("Individual was unable to clarify that [Brown] was having intent of suicide or self-harm with his current statements.")

Moreover, Civiello contacted Knowles and Dr. Bloom, members of Brown's psychiatric treatment team, to inquire as to whether further evaluation or intervention was warranted.  (*Id.* at 2-3.)  As a Psychology Services Specialist, Civiello did not have the authority to order that Brown be sent to a POC.  (ECF No. 67-7.)  She also lacked the authority to override any decision made by Knowles and Dr. Bloom regarding Brown's placement in a POC.  (*Id.*)  Thus, there are no facts in the record that could support a finding that Civiello acted with deliberate indifference toward Brown, as she did not have the authority to take any actions beyond those described above.

Brown has failed to show that there is a genuine dispute of material fact regarding the care rendered by Civiello.  Accordingly, the motion for summary judgment filed by Civiello will be granted with respect to Brown's Eighth Amendment claim against her.

    2.  <u>Claims against Knowles and Dr. Bloom</u>

Brown argues that both Knowles and Dr. Bloom, "having access to over 15 years of [his] psych files [were] well aware of [his] mental struggles," yet still refused and/or failed to respond after he reported intrusive thoughts of suicide on February 11, 2022.  (ECF No. 85-1 at ¶ 19.)

The Eighth Amendment requires that prison officials "provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle*, 429 U.S. at 105). At the same time, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Id.* at 197. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). Thus, negligent or unsuccessful medical treatment does not give rise to a claim under § 1983, and an inmate's disagreement with the nature of the medical treatment he receives is insufficient to establish deliberate indifference. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

As the Third Circuit explained, "deliberate indifference is 'evident' in certain circumstances, including: (i) the denial of reasonable requests for medical treatment that expose the complainant to undue suffering; (ii) knowledge of the need for medical care and the intentional refusal to provide such care; or (iii) the delay of necessary medical treatment for nonmedical reasons." *Mattern v. City of Sea Isle*, 657 F. App'x 134, 140 (3d. Cir. 2016) (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987)). The Third Circuit has also found the existence of deliberate indifference in situations "where prison officials . . . continue a course of treatment they know is painful, ineffective, or entails a substantial risk of serious harm." *Williams v. Kort*, 223 F. App'x 95, 100 (3d Cir. 2007) (citing *Rouse*, 182 F.3d at 197 (3d Cir. 1999) and *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)); *see also Palakovic*, 854 F.3d at 228 ("[T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements.").

15

Turning to the present matter, both Knowles and Dr. Bloom, as members of Brown's psychiatric treatment team at SCI Houtzdale, spent "significant time evaluating and observing Mr. Brown, reviewing his records, and working with his treatment team to develop appropriate plans for his care." (ECF Nos. 74-1 ¶ 7, 33; 74-2 ¶ 7, 33.) Knowles and Dr. Bloom contend that they "exercised their clinical judgment in light of their personal knowledge of [Brown's] behavior to determine that he did not require psychiatric observation on February 11, 2022." (ECF No. 69 at 20.) During the approximately three-month period from November 2021 to February 2022, Knowles evaluated Brown on at least two occasions, (ECF No. 74-3 at 479-82, 565), and Dr. Bloom evaluated Brown no less than eight separate times.[18] (*Id.* at 488-91, 501-2, 507-18, 524-29, 556-60.)

Civiello, who met with Brown on the date in question, was unable to clarify that he had the intent of attempting suicide or self-harm. (ECF No. 67-5 at 3.) Civiello did, however, determine through her conversation with Brown that further psychiatric evaluation may be appropriate, and she independently made the decision to contact Knowles and Dr. Bloom. (*Id.*) Based on the information conveyed by Civiello, coupled with their firsthand experience treating Brown and their awareness of his prior mental health history within the DOC, Knowles and Dr. Bloom ultimately concluded that the behavior observed by Civiello "appear[ed] to be [Brown's] baseline and declined for the individual to be brought up for evaluation." (*Id.* at 4.)

While Knowles and Dr. Bloom could have made a different decision, they exercised their professional judgment that it was not necessary to place Brown in a POC on February 11, 2022. Their extensive knowledge and familiarity with Brown's past medical history supports the

---

[18] The record also shows that Brown received treatment from many other medical staff members during this period.

conclusion that they were not deliberately indifferent. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The record in this case supports Knowles and Dr. Bloom's position that Brown had a clear history of "acting out" in response to housing changes or for secondary gain. (ECF No. 74-3 at 83, 112, 173, 177, 187, 252, 392, 450-51, 470, 500, 507-10, 515-18, 523-26.)  The record also clearly establishes that Brown was receiving regular mental health care treatment not only in the months leading up to his transfer to SCI Houtzdale, (*Id.* at 1-476), but also during the months that he was directly under the care of Knowles and Dr. Bloom.  (*Id.* at 477-577) (ECF Nos. 67-2 at 16-20; 67-3 at 2-7; 67-5 at 2-5.)  Although Brown may disagree with the decision not to place him in a POC, there is no evidence or indication that Knowles and Dr. Bloom knowingly and deliberately chose not to take necessary action with respect to his medical care. Rather, the record shows that Knowles and Dr. Bloom exercised their professional judgment, in light of Brown's past history and contemporaneous actions, to develop a treatment plan that they believed was appropriate given the circumstances. *See Kennedy v. S.C.I. Rockview Emps.*, 2010 WL 4853959, at *4 (M.D. Pa. Nov. 22, 2010) (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)) ("[C]ourts give prison medical personnel wide latitude in the diagnosis and treatment of inmates [and] 'should disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'").

Upon Brown's release from UPMC Altoona on February 16, 2022 shortly after Brown's self-harm, Dr. Bloom once again reaffirmed that, in his medical opinion, Brown's recent self-harm behaviors were motivated by secondary gain and a desire to manipulate his DOC housing assignment.  As his contemporaneous notes state:

17

> Mr. Brown's presentation and recent actions are consistent with acting out and efforts towards secondary gain. He engaged in self-harm upon being cleared from RTU. Currently not exhibiting an[y] objective signs of distress. Has presented similarly whether prescribed numerous psychotropics or none. Issues stemming from untoward motivations reflective of aspd[19] personality characteristics rather than mental health. As he is not exhibiting symptoms of depression and likely what has been seen in the past is more consistent with his current presentation will resolve this diagnosis to avoid diagnostic discrepancy leading to unneeded treatments or interventions. Mr. Brown may harm himself as he had done in the past which security and administration are aware of due to motivation towards acting out. This is not treatable or chronically modifiable by mental health intervention as it does not stem from psychiatric distress or symptoms so higher level of care is not indicated. Further psychiatric interventions such as POC or referral to MHU will only serve to reenforce his acting out making it more likely to occur in the future which is not in his best interest.

(ECF No. 74-3 at 576.)

Thus, even if everything that Brown said is true, Knowles and Dr. Bloom would remain entitled to summary judgment because their decision to "ignore" Brown's requests to be placed in a POC was based on their medical judgment, Brown's past medical and behavioral history, and their own experiences treating Brown. Simply put, there is no evidence that Knowles or Dr. Bloom were deliberately indifferent to Brown's medical needs. Accordingly, the motion for summary judgment of Knowles and Dr. Bloom will be granted with respect to Brown's Eighth Amendment claim against them.

### C. Conclusion

For these reasons, summary judgment will be granted in favor of Defendants Civiello, Knowles, and Dr. Bloom.

Appropriate orders will follow.

---

[19] Antisocial personality disorder ("ASPD") is "a behavioral disorder characterized by a persistent disregard for the rights of others, failure to comply with laws and social customs, and irresponsible or reckless behavior." (ECF No.72 ¶ 23.)

Dated:  June 10, 2024                              /s/ Patricia L. Dodge
                                                               PATRICIA L. DODGE
                                                               United States Magistrate Judge

cc:    BRIAN BROWN
        HC 5150
        SCI FOREST
        P.O. Box 945
        286 Woodland Drive
        Marienville, PA 16239